# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *In re Parentage of P.D.*, 2017 IL App (2d) 170355

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* PARENTAGE OF P.D., a Minor (Jack A., Petitioner-Appellee, v. Joan D., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-17-0355 |
| Filed | October 13, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 14-F-0267; the Hon. Jack G. Dalton, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Joseph P. O'Brien, of Opal O'Brien LLC, of Wheaton, for appellant.<br><br>Kevin W. Thomas, of Law Offices of Kevin W. Thomas, of St. Charles, for appellee. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion<br>Justice Jorgensen concurred in the judgment and opinion.<br>Justice Hutchinson specially concurred, with opinion. |

**OPINION**

¶ 1     Following an April 2017 hearing, the trial court denied respondent Joan D.'s request to relocate to New Jersey with her and petitioner John A.'s minor child. Joan appeals, arguing that the court's decision was against the manifest weight of the evidence. Joan also argues that the trial court erred in ruling on the petition without hearing closing arguments. We affirm.[1]

¶ 2                                I. BACKGROUND

¶ 3     Joan and John ("Jack") have one child, P.D., born September 2, 2012. Joan and Jack were never married. On May 16, 2013, Jack filed a Petition to Establish Parentage, for Joint Custody, Parenting Time, and Other Relief. A Judgment for Parentage and Custody was entered on September 20, 2013. The judgment incorporated by reference the parties' Custody and Parenting Agreement and awarded Joan and Jack joint care, custody, control, and education of P.D. Joan is the residential custodian.

¶ 4     In February 2017, Joan filed a petition under section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/609.2 (West 2016)), seeking to remove P.D. from Illinois. In her petition, Joan alleged, *inter alia*, that (1) she is the primary caretaker of P.D.; (2) she and Jack share joint decisionmaking regarding the major decisions relating to P.D.; (3) in 2015, she married her husband (Brian); (4) Brian is required to relocate to the New York City area to execute new employment duties; (5) she is employed by a company headquartered in New York City, which will allow her to maintain her employment; (6) she and Brian plan to move to Short Hills, New Jersey, a suburb 20 miles outside of New York City; and (7) the removal will enhance the quality of both her and P.D.'s life.

¶ 5     Jack filed an objection to relocation, and, in April 2017, a hearing was held on Joan's petition. The court heard testimony from the Chief Executive Officer (CEO) of Brian's employer, P.D.'s guardian *ad litem* (GAL), Joan, Jack, Brian, and Jack's parents and live-in girlfriend. In addition, exhibits were admitted into evidence, including email communications between Joan and Jack, the GAL's written report, Joan's suggested revision to the parenting schedule proposed by the GAL, an agreed order modifying the parties' parenting and custody agreement with respect to Jack's parenting time, and SEC documents regarding Brian's employer and the terms of Brian's employment agreement. Highlights of the testimony and evidence are broadly summarized here, while facts with specific pertinence to a determination of P.D.'s best interests are discussed more fully in the Analysis section.

¶ 6     One year prior to filing the instant petition, Joan filed a petition to relocate P.D. to California, where Brian had started an Internet business and resided at the time. In a preliminary report, the GAL recommended that the petition be denied, stating his concern that allowing Joan to move to California would "permit her to continue treating Jack as an outsider despite the fact that he is P.D.'s father." He was also concerned that Joan had not made a reasonable "good faith effort" to establish a schedule of parenting time for Jack and that travel between Illinois and California would have a detrimental impact on P.D., who was then three and one half years old. Joan voluntarily dismissed the petition, however, when Brian began

---

[1]This disposition is filed 1 day after the 150-day term mandated by Illinois Supreme Court Rule 311(a)(5) (eff. Feb. 26, 2010) due to temporary Internet inaccessibility.

negotiations to sell his company to his current employer, Function(x), an Internet social publisher headquartered in New York City.

¶ 7   At the time the instant petition for removal was filed, Brian worked as Chief Operating Officer (COO) for Function(x) and resided with Joan and P.D. in Joan's house in Elgin, Illinois. His negotiated contract with Function(x) states "we anticipate that you will be based in our Elgin, IL, office but will travel to and work from our New York City Office as reasonably requested." The agreement includes compensation for the travel to and from New York City. Brian earns a base salary of $250,000, with substantial bonus provisions that are contingent upon the company's financial performance.

¶ 8   Brian testified at trial that he resides "half of the time" in Elgin and the other half in New York and sometimes is in New York for a full week at a time. Being away from Elgin impairs his ability to assist Joan and participate in P.D.'s life. He believes his COO duties require him to be in the New York City office full time, although he has successfully performed those duties to date while residing in Elgin. He is concerned he will lose his job if he does not move. The CEO of Function(x) testified that due to expansion of the company, he now considers it a requirement of Brian's COO position that he relocate to New York City. He did not say that Brian would be fired if he did not relocate.

¶ 9   Joan currently is an account specialist in the food service sector of a market research company, earning approximately $50,000 per year. The company is headquartered in Fort Washington, New York, and has an office in New York City. She is confident she will be able to find equivalent employment if the removal is allowed.

¶ 10   Joan feels it is in P.D.'s best interest to relocate to New Jersey because it is important to keep the family together and she is the primary caregiver. She also believes the move will enhance P.D.'s quality of life because Short Hills, New Jersey, is an affluent, "family friendly" area, with "top notch" schools. The specific house they are looking at is "nicer" and "bigger" but still has "the yard P.D. enjoys playing in." She and Brian chose a suburban environment because that is what P.D. is used to and they "wanted to keep it a stable transition for him."

¶ 11   Jack lives in St. Charles, Illinois, and works as a car salesman, earning in the vicinity of $100,000 per year. He currently has parenting time with P.D. each week from Tuesday afternoon overnight to Wednesday morning and alternating weekends from Friday evening to Sunday evening. The longest extended period of time he goes without seeing P.D. is six days. He is concerned that his relationship with P.D. could be damaged if he does not see him with the same frequency as he does now. He testified that it is not in P.D.'s best interest to be relocated to New Jersey and noted in particular that all of P.D.'s extended family lives in Illinois.

¶ 12   The GAL testified that he recommended the petition for removal to New Jersey be allowed because the circumstances that persuaded him to recommend denying the prior petition had changed. Although he remained concerned about Joan's attitude toward Jack, communication between them had improved. Additionally, the distance P.D. would need to travel is considerably less. He acknowledged that the relocation would have a "significant impact upon ** [Jack's] relationship with his son," but also observed that "the business opportunity for Brian is an incredible one for him, and as a result it's an incredible opportunity for the family, and that P.D. will benefit as well."

¶ 13   In his report, the GAL proposed a parenting schedule that would give Jack approximately the same number of days with P.D. as he currently enjoys, with 60 days consolidated in a single

period during the summer and an additional 29 days distributed among holiday school breaks. After the GAL submitted the proposal, Joan submitted a "suggested revision," which provided that Joan would have P.D. in Illinois for four of the summer weekends, added seven additional parenting days for Jack in the spring, and required three of the other visitations to occur in New Jersey.

¶ 14                                    II. ANALYSIS

¶ 15        Prior to 2016, section 609 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/609 (West 2014)) allowed a trial court to grant a custodial parent permission to remove a minor child from Illinois when it is in the child's best interests. The parent seeking removal has the burden of proving, by a preponderance of the evidence, that removal would be in the child's best interest. See *id.*; *In re Parentage of Rogan M.*, 2014 IL App (1st) 141214, ¶ 8.

¶ 16        In applying section 609, the Illinois Supreme Court stated, "[a] determination of the best interests of the child cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988). The *Eckert* court identified certain factors that might aid the trial court in determining the best interests of the child, including (1) the likelihood that the proposed move will enhance the general quality of life for both the custodial parent and the child; (2) the custodial parent's motives for seeking removal, to determine whether the proposed move is a ruse designed to frustrate or defeat the noncustodial parent's visitation; (3) the noncustodial parent's motives in resisting removal; (4) the effect removal will have on the noncustodial parent's visitation rights because it is in the best interests of a child to have a healthy and close relationship with both parents, as well as other family members; and (5) whether a reasonable visitation schedule can be worked out. *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 522-23 (2003) (citing *Eckert*, 119 Ill. 2d at 326-27). In *Collingbourne*, the supreme court observed that the purpose of the *Eckert* factors is not to establish a test in which the parent seeking removal must meet every prong; rather, the *Eckert* factors are to be considered and balanced by the trial court and no one factor is controlling. *Id.* at 523.

¶ 17        In 2016, the General Assembly repealed section 609 of the Dissolution Act and replaced it with section 609.2 of the Dissolution Act (750 ILCS 5/609.2 (West 2016)). Section 609.2 now provides the procedure by which a parent may seek to "relocate" with a child. The legislature also listed eleven factors a trial court must consider in determining the child's best interests:

    "(1) the circumstances and reasons for the intended relocation;

    (2) the reasons, if any, why a parent is objecting to the intended relocation;

    (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

    (4) the educational opportunities for the child at the existing location and at the proposed new location;

    (5) the presence or absence of extended family at the existing location and at the proposed new location;

    (6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g) (West 2016).

We are unaware of a prior appellate opinion reviewing a trial court's application of the section 609.2(g) factors for determining whether relocation is in the child's best interests.

¶ 18 A trial court's determination regarding the child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence and it appears that a manifest injustice has occurred. *Eckert*, 119 Ill. 2d at 328. The trial court's decision is against the manifest weight of the evidence only if the evidence "clearly" calls for a conclusion opposite to that reached by the trial court or only if the factual findings on which the decision depends are clearly, plainly, and indisputably erroneous. *Wakeland v. City of Urbana*, 333 Ill. App. 3d 1131, 1139 (2002). There is a strong and compelling presumption in favor of the result reached by the trial court in a removal case. *In re Marriage of Dorfman*, 2011 IL App (3d) 110099, ¶ 46 (citing *Eckert*, 119 Ill. 2d at 330). Reviewing courts grant great deference to the trial court's removal decision, as the trial court is in the best position to observe the parties and assess their personalities and capabilities. *Dorfman*, 2011 IL App (3d) 110099, ¶ 46. See also *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 516 (1992) (the trial court is in the best position to make fact-intensive determinations "as it has the opportunity to hear the evidence while viewing the witnesses and their demeanor").

¶ 19 In its order denying the petition, the trial court specifically mentioned the section 609.2(g) factors and weighed each one. "It is not the function of this court to reweigh the evidence or assess the credibility of testimony and set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence." *Pfeiffer*, 237 Ill. App. 3d at 513. Our review reveals that the trial court's judgment not to allow the removal of P.D. to New Jersey is not against the manifest weight of the evidence.

¶ 20 The first factor to be considered under section 609.2(g) is the circumstances and reasons for the intended relocation. Joan asserts that her husband, Brian, will be able to take advantage of his job opportunity as COO of Function(x) only if he relocates from Elgin to the New York City area and that he will, in fact, lose his job if he does not move. She argues that if she and P.D. relocate with Brian, maintaining the family unit would be less stressful, it would be easier for Brian and P.D. to strengthen their already good relationship, and due to an increase in income, the family unit would receive such benefits as "a nicer home, a more affluent neighborhood, the ability to participate in extracurricular activities and other activities and vacations, and a higher standard of living."

¶ 21 The evidence accrued at trial with respect to the first factor does not unequivocally support Joan's assertions, as she contends. First, Brian's employer testified that he considered it a requirement of Brian's COO position that he relocate to New York City but stopped short of

stating that Brian would be fired if he did not relocate. Additionally, the contract Brian negotiated with Function(x) upon his promotion from CRO to COO and entered into on February 1, 2017, "anticipates" that he will be based in Elgin, and by all accounts, including Brian's own, he has successfully performed his COO duties while residing in Elgin, albeit with frequent and lengthy commutes to New York City. Brian testified that it has not been indicated to him that his job is in jeopardy. With respect to Brian's income, the firm's bonus structure indicates that he could earn considerably more than his $250,000 yearly salary, but whether he will actually do so is a matter of speculation. His contract provides that Brian could be terminated without cause, in which case he would be entitled to three month's salary. Additionally, with respect to Joan's current house, where she, Brian and P.D. reside, the GAL testified that "although modest," it is "very nice."

¶ 22    At the same time, the evidence showed that P.D. and Brian have a close relationship, that the family dynamic has included Brian's involvement in P.D.'s daily care, and that the considerable time Brian must be in New York takes a toll not only on their relationship, but also on the family unit's stability.

¶ 23    The trial court concluded, however, that even if the first factor were to favor allowing relocation, it is counterbalanced by the second factor: the reasons why Jack is objecting to the intended relocation. Jack is concerned that his close father-son relationship with P.D. will suffer if he cannot be with P.D. on a frequent and regular basis. He is also concerned about the impact of the relocation on P.D.'s relationship with Jack's parents, who are active in P.D.'s life, and his other grandparents and extended family. All three sets of parents—Jack's, Joan's, and Brian's—as well as other family members, live in the vicinity of Elgin. No relatives live in the New York City or New Jersey vicinity. Accordingly, Jack does not consider this relocation proposal to be an option.

¶ 24    Joan argues that Jack's failure to investigate the relocation destination—the school, home, and community Joan wishes to move to with P.D.—indicates that he may not have P.D.'s best interests at heart. She further argues that Jack "does not particularly enjoy or excel at his job" as a car salesman. Surmising that neither Jack nor his parents "are tied to Illinois," Joan speculates that, with investigation, Jack "could have found a job he would have enjoyed more in the New Jersey or New York City area." The evidence, however, does not support these assertions. After being temporarily laid off, Jack was rehired by his employer and, due to his performance at the franchise, was able to negotiate a work schedule that coincides with his parenting schedule. He is proud of negotiating this schedule and stated that, despite being off every other Saturday, he earns six figures annually. (According to the GAL's report, Jack earned in excess of $100,000 annually prior to his layoff.)

¶ 25    Third, the trial court considered the history and quality of each parent's relationship with P.D. and specifically whether either Joan or Jack has substantially failed or refused to exercise the parental responsibilities allocated to her or him under the parenting plan or allocation judgment. The court agreed with the GAL that this factor was "neutral."

¶ 26    The evidence supports this assessment. While Joan is the custodial parent and has served as the primary caretaker, Jack has always sought to be involved, and he has always sought additional time with P.D. and currently fully utilizes his parenting time. The court's conclusion that this factor favors neither party was not against the manifest weight of the evidence.

¶ 27    Joan points out that Jack entered into an agreed order eliminating his Thursday parenting time and that he chooses alternative weekends for parenting time. The GAL testified that the

Thursday morning parenting time became unworkable after the parties entered into the original visitation agreement because Joan moved farther away. As to alternating weekends of parenting, the GAL noted that, to his knowledge, Saturday "would certainly be the busiest day to be a car dealer." We do not agree with Joan that this factor favors relocation.

¶ 28 The fourth section 609.2(g) factor is the educational opportunities for P.D. at the existing location and at the proposed new location. The trial court concluded that it was not provided with an evidentiary basis to decide this factor. The evidence presented on this factor does not clearly call for a conclusion opposite to that reached by the trial court.

¶ 29 Joan argues that the GAL "opined at trial and in his [r]eport that the educational opportunities for P.D. in the New Jersey area where Joan and Brian intend to relocate are far superior to those in the school district where Joan currently resides." The GAL also stated in his report that the New Jersey schools "far exceed[ed]" any private school P.D. might attend in the Elgin area. Upon examination by the court, however, the GAL conceded that he could not recall comparing the parochial school currently attended by P.D. with New Jersey schools and had no documentation to confirm how Elgin Academy, for example, would rank against the public schools in New Jersey. Although Joan testified that P.D. would be attending public school in New Jersey, she acknowledged that she and Jack had not discussed where P.D. would go to school next year if he stayed in Elgin.

¶ 30 Joan and Brian also testified as to the excellence of the New Jersey schools but identified no basis for their beliefs other than presumed general knowledge ("we have all heard about the schools") and the representations of a New Jersey realtor. Joan's comment that Jack "did not even investigate the schools in Short Hills, New Jersey" is a red herring. It is Joan's burden to prove, by a preponderance of the evidence, that removal would be in P.D.'s best interest. *Rogan M*., 2014 IL App (1st) 141214, ¶ 7. Given that the trial court was presented with no comparison of the New Jersey school Joan has picked out for P.D. with the Elgin school P.D. currently attends, we cannot say that the court's conclusion that it could not decide this factor was against the manifest weight of the evidence.

¶ 31 The fifth factor is the presence or absence of extended family at the existing location and at the proposed new location. The trial court found that this factor "overwhelmingly favors denial of relocation." The manifest weight of the evidence clearly supports the trial court's finding. P.D. has an extended network of family relationships in or near Elgin, including three sets of grandparents (Jack's, Joan's, and Brian's), Jack's sister, and cousins. Many of these relationships involve significant contact with P.D., and the parties agreed that they are important to his well-being. If relocation were allowed, his only family contacts would be with his mother and step-father. We note that Joan avoids this factor altogether on appeal, although she did indicate at trial that because her family and Brian's family are both located in Illinois, she would bring P.D. to Illinois from time to time for family events.

¶ 32 The sixth factor is the anticipated impact of the relocation on P.D. Joan argues in favor of the GAL's observation that because P.D. is young, relocation would not disrupt established friendships or involvement in sports, clubs, or other activities. The GAL also noted, however, that Jack had advised him that P.D. enjoys his time at school and is making friendships with the other children. At trial, Jack testified to the "overall harm" to P.D. of relocating at this age: "P.D. does have friends. He knows all of his family members. He knows the difference between Elgin, South Elgin and St. Charles. He is four and a half years old." The GAL acknowledged that relocation would mean "wrenching him away from a very good father" and

that P.D. would "certainly miss his father." Ultimately, under examination by the court, the GAL agreed that "saying P.D. is not yet of school age is really just saying it wouldn't do as much damage to him now as it might later to make this move."

¶ 33    Joan takes issue with the trial court's finding that P.D. would gain only "the possibility of indirect benefits" from the relocation. She argues that "the direct benefits to the child *** would include *** a bigger house with air conditioning, fantastic schools and educational opportunities, low crime rates, the ability to participate in extracurricular activities, increased household income, and a general increased quality of life." Although the GAL agreed that the area where they would be living in New Jersey "is comprised of larger and more expensive residences," he also noted that P.D.'s current home and neighborhood are "very nice," and the finder of fact, who lives in Elgin and is familiar with P.D.'s neighborhood, called it "lovely." As explained above, the educational opportunities were not shown to be greater in New Jersey. No evidence was presented as to "the ability to participate in extracurricular activities." Whether the household income would increase is subject to unknowable future events. With respect to P.D.'s "quality of life," the GAL reported that "P.D. participates in activities with (Jack) and (Jack's) parents, who are members at Medina Country Club, and they enjoy activities there, whether it's golf or swimming or parties or what have you." The trial court's finding that Joan did not bear her burden of proving that the impact of moving on P.D. would be beneficial is not against the manifest weight of the evidence.

¶ 34    Joan further contends that the court erred in not giving enough weight to the first factor enunciated by the supreme court in *Eckert*, which Joan asserts is "the likelihood of enhancing the general quality of life of the custodial parent." In fact, the first *Eckert* factor directs the court to "consider the proposed move in terms of likelihood for enhancing the general quality of life for *both* the custodial parent *and the [child]*." (Emphases added.) *Eckert*, 119 Ill. 2d at 326-27. The trial court was presented with a great deal of evidence suggesting that Joan's general quality of life was likely to be enhanced. The court chose to focus, however, on whether the general quality of P.D.'s life was likely to be enhanced. We believe this was the correct approach given the recent enactment of section 609.2(g), which omits the first *Eckert* factor, references only the best interests of the child, and does not mention the custodial parent. See 750 ILCS 5/609.2(g) (West 2016).

¶ 35    Joan asserts that "[t]he case law requires the [c]ourts to continue to consider *** the 'trickle-down effect' " of benefits upon a family's children. She cites no supporting authority for this statement. The GAL also characterized the benefits P.D. would receive from the move as "trickle-down benefits." By definition, however, "trickle-down" benefits are indirect. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/trickle-down (last visited Oct. 23, 2017) ("an effect caused gradually by remote or indirect influences"). Moreover, whether—and to what degree—a trickle-down effect will occur is a matter of speculation. We do not believe that "trickle-down benefits" are what the *Eckert* court contemplated when it required courts to consider the "likelihood" for enhancing the quality of life for the child as well as the custodial parent. *Eckert*, 119 Ill. 2d at 326-27.

¶ 36    Finally, we note that when amending a statute, the legislature is presumed to have acted with knowledge of the prevailing case law. *U.S. Bank Trust National Ass'n v. Junior*, 2016 IL App (1st) 152109, ¶ 27 (citing *Morris v. William L. Dawson Nursing Center, Inc.*, 187 Ill. 2d 494, 499 (1999)). "A subsequent amendment to a statute may be an appropriate source for discerning legislative intent." (Internal quotation marks omitted.) *In re Application of*

*Skidmore*, 2011 IL App (2d) 100730, ¶ 28. The legislature presumably had knowledge of the supreme court's decisions in *Eckert* and *Collingbourne* and yet chose not to include the first *Eckert* factor in the new statutory directives for determining a child's best interests. The legislature evidently intended to emphasize the child's best interests over those of the custodial parent. Given the new statutory directives, we find the reasoning of *Eckert* and *Collingbourne* and progeny, to the extent it requires weighing the likelihood that the move will enhance the custodial parent's quality of life, is unhelpful in evaluating the trial court's best-interest determination in the case before us. *Cf. In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 32 (similar finding with respect to section 609.2's new statutory regulations on parental relocation).

¶ 37        The seventh factor to be considered in determining the child's best interests is whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs. Citing Joan's and Brian's apparent willingness to provide Jack with parenting time, as well as their financial resources, the GAL's report simply stated his belief that "a schedule can be formulated that would be reasonable under the circumstances." The trial court, however, observed that parenting time was not the only aspect of parental responsibilities to be considered, noting that the parties currently have a "joint custody order" that provides for Jack's participation "in all the major decisions." See Black's Law Dictionary 412-13 (8th ed. 2004) (joint custody is "most often defined as meaning *** that both parents will share in the decisions concerning the child's care, education, religion, medical treatment and general welfare" (internal quotation marks omitted)).

¶ 38        The trial court expressed its concern that the relocation would adversely affect Jack's ability to fulfill his parental responsibilities, given the historically poor communication between the parties. The parties and the GAL testified that both parents bear responsibility for the communication problem and also that their relationship was improving, partly due to Brian's efforts as a "buffer" between them.

¶ 39        As for parenting time, Joan rejected the GAL's proposed schedule, which would place P.D. with Jack for 60 straight days in the summer, and Jack rejected Joan's alternative schedule, which would include his traveling to New Jersey multiple times per year. The issue of who would accompany P.D. on flights between New Jersey and Illinois was not resolved, nor was the question of how transportation and lodging costs would be paid. Joan indicated that she and Brian had the financial resources to contribute to P.D.'s travel costs, and they "might pay for some of [Jack's transportation]," but also testified that the travel burden should be on Jack: "Jack is a grown adult. He can come visit his son, if it's important enough to him."

¶ 40        Joan acknowledges that the move to New Jersey would diminish Jack's frequent contact with P.D. but argues that the schedules proposed by the GAL and Joan would allow Jack a similar amount of time with P.D. Jack testified about things he would not be able to do with P.D. if he lived in New Jersey, including "living in a suitable nearby household" and discovering "if he had changed his favorite color from green to red or back to green again." In short, he would not "be able to have any normal visibility whatsoever" in P.D.'s life if either proposed schedule were approved. The trial court observed that the parenting time Jack currently enjoys is aligned with his work schedule and maximizes the amount of parenting time he has when he is not working. The court concluded that the quality of Jack's current parenting time would not be met by the schedule proposed by the GAL or by Joan.

¶ 41    With regard to factor eight—the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation—no evidence was presented. Given P.D.'s age, the trial court stated it was uncertain it would give weight to this factor even if evidence were presented.

¶ 42    Factor nine is "possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child." The GAL's report stated with respect to this factor: "Joan and her [h]usband appear to have substantial financial resources and from this fact could bear the cost of transportation in furtherance of a schedule of parenting time for Jack." The trial court noted that in her testimony at trial, Joan did not offer to pay the costs—including travel, hotels, and meals—that Jack would incur under her proposal that would require him to spend part of his parenting time in New Jersey.

¶ 43    Joan argues that the court's analysis is "improper," stating the "question is, given the parents' resources, could the costs of the proposed parenting schedule be reasonably afforded by the parties?" The statute, however, contemplates "possible arrangements appropriate to the parents' resources and circumstances." According to Joan, "Brian's income at worst would be around $450,000.00 annually, [and] Joan would probably be able to keep her job in New York or find comparable employment." Jack, on the other hand, "is employed and earned $100,000.00 in the past as a car salesman." Given the disparity in the parents' resources, we believe the court properly considered Joan's reluctance to assist Jack in determining whether arrangements for exercising his parental responsibilities in New Jersey were "possible" under this factor. During his testimony, the GAL agreed with the court that the fact that Joan and Brian can afford to pay to facilitate Jack's parenting time does "not necessarily" resolve whom factor nine favors.

¶ 44    The trial court also considered P.D.'s developmental level. The proposed schedules would entail either 16 or 20 trips between Illinois and New Jersey, which, the court calculated, could require four-and-a-half-year-old P.D. to spend half a day in transportation for close to three weeks per year. Joan does not specifically address the travel burden or P.D.'s developmental level on appeal.

¶ 45    The tenth factor is "minimization of the impairment to a parent-child relationship caused by a parent's relocation." In its examination of the GAL, the trial court recited the GAL's comment in his "Preliminary Oral Report" submitted in relation to Joan's petition to relocate to California:

    "Of concern to me is the fact that as long as I have been involved in this matter Joan has shown absolutely no patience for Jack's involvement with the child nor has she, in my opinion, made even the slightest effort to try and open lines of communication or to treat either Jack or his family as the parents [*sic*] or grandparents of P.D. I do not believe that this necessarily means that Joan has an improper motive in wanting to move to California, but my larger concern is that if she is allowed to move to California is her behavior going to continue in such a distant jurisdiction to the point where she will attempt to cut Jack out of [P.D.'s] life?"

¶ 46    In response to the court's inquiry as to whether this was still a concern, the GAL stated that he did not think Joan would try to cut Jack out of P.D.'s life if they relocated to New Jersey, since Brian's involvement had led to a "softening of the relationship of the parties." He also acknowledged that his report and testimony in the present relocation proceeding contained

multiple references to Joan's attitude toward Jack, including "I do wish at times from my observation that [Joan] showed [Jack] more respect as a father" and Joan "basically treats Jack as something of an intrusion upon the family dynamic that she would prefer." In recommending that the petition be allowed, the GAL stated: "I remain concerned, as I have during my entire involvement in this matter, with the attitude of Joan. If she does not show a willingness to facilitate the relationship between Jack and [P.D.,] [c]ourt [o]rders will need to enter rectifying the situation." The trial court concluded that because Joan "does not show a willingness to facilitate a positive relationship between father and son," the tenth factor "strongly favors denial."

¶ 47    No evidence was presented on the eleventh factor, "any other relevant factors bearing on the child's best interests." Joan posits in her brief that this might be the appropriate place to consider the impact of the move on Joan's life. See *Eckert*, 119 Ill. 2d at 326-27 (the "likelihood for enhancing the general quality of life for both the custodial parent and the [child]"). As explained above, we believe the trial court properly placed consideration of P.D.'s best interests above the likely enhancement to Joan's general quality of life as a result of relocating to New Jersey.

¶ 48    As a final note, we acknowledge the case law cited by the parties in support of their positions on the various section 609.2(g) factors. Although the cases were all decided before the enactment of section 609.2(g), they are not irrelevant to some of the factors. However, as the supreme court observed, a determination of the best interests of the child "must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *Eckert*, 119 Ill. 2d at 326. The parties readily distinguish the circumstances of each other's cases from the circumstances of the case before us. Accordingly, we find that the cited cases provide negligible assistance in reviewing the trial court's application of the section 609(g) factors to the circumstances of this case.

¶ 49    Having analyzed each factor individually, we note that when we view the totality of the circumstances, we reach the same conclusion. In determining whether to grant or deny a petition for removal, some factors may inevitably weigh more heavily than others. The final decision in a removal case ought not be based on which party won the most factors. To the contrary, the legislative enumeration of factors does not limit the trial court to a check list tally nor preclude the trial court from considering all of the circumstances to arrive at a reasonable result. The points raised in the special concurrence give context and clarity to the application of the statutory factors and remind us that the trial court should consider the totality of the circumstances in exercising its discretion. Based on the foregoing evidence and trial court findings, we conclude that the denial of the petition to remove P.D. to New Jersey is not against the manifest weight of the evidence.

¶ 50    We turn to Joan's second argument, that the trial court committed reversible error by not allowing her to present closing arguments. Joan has forfeited this argument because she did not request the opportunity to present a closing argument, nor did she object when the court ruled without hearing arguments. See *In re Marriage of Sharp*, 369 Ill. App. 3d 271, 276 (2006) (a matter not properly presented to the trial court by the appellant will not be considered on appeal). The trial transcript shows that at the end of the evidence, the trial court asked, "Are we all finished?" Joan's counsel responded, "Yes, sir." After the court set forth its reasoning and ruling, which consumes more than 15 pages of transcript, counsel merely said, "Judge, I will

prepare an order" and then requested Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010) language. Any perceived error in the court's procedure was not brought to the court's attention.

¶ 51 Forfeiture aside, we do not believe the court abused its discretion in not hearing argument. The case was tried without a jury in a bench trial. "Oral argument in a civil proceeding tried, as here, by the court without a jury is a privilege, not a right, and is accorded to the parties by the court in its discretion." *Parkway Bank & Trust Co. v. Meseljevic*, 406 Ill. App. 3d 435, 441 (2010) (citing *Korbelik v. Staschke*, 232 Ill. App. 3d 114, 118-19 (1992)). The bench trial lasted approximately eight hours and involved relatively uncomplicated subject matter. Moreover, the report of proceedings reflects that the trial judge took extensive notes. See *Korbelik*, 232 Ill. App. 3d at 119 (finding no abuse of discretion in refusing to allow the plaintiff to make a closing argument where the case involved a short trial with uncomplicated facts and the judge took extensive notes). The trial court did not abuse its discretion in declining to allow closing arguments.

¶ 52                            III. CONCLUSION
¶ 53 For the reasons stated, we affirm the judgment of the Kane County circuit court.

¶ 54 Affirmed.

¶ 55 JUSTICE HUTCHINSON, specially concurring.
¶ 56 I agree with the majority's analysis and conclusion in this case. I write separately only to comment on the larger issues created by relocation of a child after a marriage or a relationship ends. As a trial court judge, relocation decisions were some of the most difficult decisions I had to make. As judges, we have guidance from the supreme court by way of the *Eckert* factors (see *In re Marriage of Eckert*, 119 Ill. 2d 316, 326-27 (1988)), and the legislature has provided new additional guidance in section 609.2(g) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/609.2(g) (West 2016)); however, the ultimate responsibility for the best interests of a child rests with his or her parents.

¶ 57 When a relationship creates a child, and then that relationship ends, it is important that both parents continue to participate to the fullest in the child's life. See *Eckert*, 119 Ill. 2d at 327; *In re Marriage of Repond*, 349 Ill. App. 3d 910, 919 (2004); *Keefer v. Keefer*, 107 Ill. App. 2d 74, 78 (1969). While that relationship is often a marriage, a child's best interests are no less important because his or her parents never married. In either case, it is reasonable and expected that the parents will move on in their own personal lives. My primary concern however is that they not pursue their individual happiness at the expense of the child's relationship with the noncustodial parent.

¶ 58 The prospect of relocation of families looms large in today's employment market, and the odds of a parent seeking relocation are doubled when a new spouse enters the picture. Simply put, this is an issue that needs to be discussed, carefully considered, and understood prior to the new marriage. I recognize that the happiness of the custodial parent who requests relocation is a consideration here; it is certainly a factor in the balance, even if it is not a listed factor in *Eckert* or in section 609.2(g). However, that happiness pales in comparison to the best interests of the child when the child is separated by distance from a parent who has been involved in the

child's day-to-day activities and the extended family members who have also nurtured the child since birth.

¶ 59 Here, "a nicer home" in "a more affluent neighborhood" with additional privileges fueled by an impressive family income is noteworthy, but there is a dark side to these material issues. If relocation is allowed, P.D. will interact with his father less personally and less often, travel a long distance to have time with his father, and will be isolated from most of his extended family, especially those family members on his father's side. Electronic communication is helpful in these situations, but a 4-year-old child has little patience for or understanding of the technology. Adults are better suited to using electronic communication with each other, even though doing so due to the geographic separation of the newly married couple is an inconvenience for the couple.

¶ 60 Finally, when the parent requesting relocation has a history of placing roadblocks, however slight, in the way of the relationship between the child and the noncustodial parent, distance between the noncustodial parent and the child takes on an added significance. School activities, extracurricular participation, and important milestones in the child's life often cannot be attended by the parent who remains behind; his or her involvement comes through the eyes and ears of third parties, if it comes at all. But the distance itself, as an additional and intentionally placed hurdle, is simply unacceptable. As related by the GAL and the trial court, there is some evidence here that Joan sees Jack's parenting time more of an annoyance than an important and essential part of P.D.'s development. In addition, Joan wanted changes to the GAL's proposed parenting-time plan requiring Jack to remain in New Jersey for some visits where he likely has no connections, would need hotel accommodations, and is not familiar with child-appropriate activities in the area. Joan's request was apparently just another roadblock designed to alienate Jack from P.D.'s life. She offered no evidence to show that her request was at all practical, or reasonable, or in P.D.'s best interests.

¶ 61 In a recent case, this court cautioned that a parent's greater share of parenting time could not be "transmogrif[ied]" into *carte blanche* to unilaterally change the children's surnames, particularly as a means of alienating them from their father. *In re Marriage of Piegari*, 2016 IL App (2d) 160594, ¶ 9. Given the quality of the evidence presented, Joan appears to be asserting a similar privilege—*i.e.*, that her greater share of parenting time and increased wealth in her new marriage entitles her to remove P.D. to New Jersey, away from P.D.'s father and family. The law does not recognize any such right. As the trial court correctly determined, the evidence presented simply did not warrant P.D.'s removal.

¶ 62 With these observations in mind, I specially concur.