NOTICE

Decision filed 02/02/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230660-U

NO. 5-23-0660

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| CHRISTINA HAYWOOD, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 13-F-556 |
| | ) | |
| WALTER JOHNSON, | ) | Honorable |
| | ) | Ramona Sullivan, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's allocation of parental decision-making authority and parenting time was not against the manifest weight of the evidence where the record revealed that the court considered the relevant best-interest factors and the evidence presented on those factors.

¶ 2    The petitioner, Christina Haywood, appeals from the trial court's allocation of sole parental decision-making responsibilities for education and healthcare and the majority of parenting time of the parties' minor child, Myanna J., to the respondent, Walter Johnson. In her *pro se* appellate brief, Christina contends that the trial court failed to consider, when determining Myanna's best interests, Myanna's wishes, Christina's dedication to Myanna's overall development as evidenced

1

by her active participation in Myanna's schooling, and her concerns about Myanna's cleanliness and wellbeing while in Walter's care. For the reasons that follow, we affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4     The parties had one child, Myanna, born on September 13, 2013; the parties never married. Christina was Myanna's primary caregiver until 2019, when Myanna was removed from her care and placed in foster care. In January 2022, Myanna was placed in Walter's home. On July 21, 2022, Walter was awarded custody of Myanna in the juvenile court case (Cook County case No. 19-JA-834). On August 26, 2022, Christina filed a *pro se* petition for allocation of parental responsibilities, in which she requested that significant decision-making authority and parenting time be allocated equally between the parties. In the petition, she indicated that Myanna was currently living with Walter and had resided there since January 14, 2022; and that the July 21, 2022, order in the juvenile court case allocated parental decision-making authority to him but did not allocate parenting time between the parties. After that, Walter refused to communicate with Christina about Myanna, and Christina had not seen Myanna since July 16, 2022.

¶ 5     On December 19, 2022, Walter *pro se* filed a proposed parenting plan, which attached a letter from him in which he expressed his concerns about Christina having unsupervised overnight visits with Myanna as, over the past 3½ years, Christina had not had more than two hours of supervised visits with Myanna. He indicated that, since the juvenile case closed, Myanna was

---

[1]We note that the respondent has failed to file an appellee's brief. There are three distinct, discretionary options a reviewing court may exercise in the absence of an appellee's brief: (1) it may serve as an advocate for the appellee and decide the case when the court determines justice so requires, (2) it may decide the merits of the case if the record is simple and the issues can be easily decided without the aid of the appellee's brief, or (3) it may reverse the trial court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record. *Thomas v. Koe*, 395 Ill. App. 3d 570, 577 (2009). In this case, the record is simple, and the claimed errors are such that we can easily decide them without the aid of the appellee's brief.

emotional and confused, and she was no longer in services to help her process her feelings. Myanna was acting out, which led to chaos at home and school, and she was suspended five times at school since August. Myanna wanted to live with Christina, and she believed that if she misbehaved, Walter would eventually send her to live with Christina.

¶ 6 Walter permitted Christina to have a visit with Myanna after the juvenile case closed, but, during that time, she questioned Myanna about his home, his parenting, and his other children. Christina then made false allegations to the Illinois Department of Children and Family Services (DCFS) and false police reports about him, stalked his home, unexpectedly showed up at Myanna's school, relentlessly called him, and verbally attacked him. He noted that Christina's behavior was witnessed by Myanna and his other children.

¶ 7 Walter requested that Christina only have supervised visits until it was deemed safe by a counselor for Myanna to stay overnight in Christina's home. He also requested that Christina and Myanna engage in counseling to determine whether Christina could provide a safe environment for Myanna and address the reasons why Myanna was initially placed into care. On February 6, 2023, the trial court entered a temporary order regarding parenting time, in which it allocated the majority of parenting time to Walter but allocated in-person parenting time to Christina on alternating Sundays from 11 a.m. to 3 p.m. and electronic parenting time on Mondays at 5 p.m. On April 20, 2023, the court entered an order appointing a guardian *ad litem* (GAL) for Myanna.

¶ 8 On June 26, 2023, the GAL filed a report after interviewing Christina, Walter, Desirii Johnson (Walter's wife), Christina's previous daycare provider, Christina's counselor, and Myanna. The report indicated that Myanna was removed from Christina's residence in July 2019 because Christina left her alone over night at home while at work. Myanna was then in foster care for more than two years. While in care, Myanna experienced several disrupted placements

3

including one where she experienced trauma. In January 2022, she transitioned from her foster care home to Walter's home.

¶ 9 Because there were concerns about Myanna's successful integration into Walter's home, family counseling was initiated to support and prepare Walter, Desirii, and their children. In the family counselor's July 15, 2022, report, the counselor noted that Walter made sure that Myanna was available for counseling sessions, was engaged in skill instruction, and practiced those skills in between sessions. The counselor also noted that Walter and Desirii were open to discussions about future visitation plans and ways to support a continued relationship between Myanna and Christina. The counselor opined that Walter and Desirii were fully equipped to support and reinforce Myanna's continued social and emotional development and full integration into their blended household. She indicated that they were knowledgeable about the possible warning signs of declining mental health and ways to reenlist treatment for Myanna should the need arise.

¶ 10 The counselor noted that, although Myanna questioned why she could not return to Chrstina's home, Myanna had a strong bond with Walter. Myanna's violent play themes that were previously observed had dissipated, her play and interaction skills had been more in line with age level expectations, and her ability to discuss her feelings on difficult situations had improved. However, Myanna had been suspended 12 times from school for physical confrontations with students, throwing food at students, pulling the fire alarm, hitting a teacher, disruptive behavior, and theft of her teacher's cell phone. The counselor indicated that Myanna required consistency, structure, explicit support of her relationship with Christina, and a preplanned visitation arrangement with Christina.

¶ 11 The GAL report then indicated that Christina lived in a two-bedroom trailer in Blue Island, Illinois, and she was employed at Ingalls Hospital. She owned a four-bedroom home in Matteson,

4

Illinois, and she would move there when her other children were returned to her care; she had three other children, ages 16, 7, and 2. Christina acknowledged that she left her children home alone several times while she was at work. However, she explained that she made a meal schedule for each of them, had a care plan inside the home, and a neighbor checked on them; her oldest child was 12 at the time. The children were removed from her care after someone observed them walking alone on a main street. She indicated that she had accepted responsibility for this incident and had been in counseling since 2019. She also acknowledged that, in 2016, there were allegations of physical abuse toward her oldest child, which resulted in a founded report from DCFS.

¶ 12    Christina also indicated that Myanna was not initially placed with Walter because he had only sporadically seen Myanna prior to the juvenile case. She expressed concern that Myanna was not being properly cared for in Walter's home, claiming that Myanna's clothing was too small and damaged, and there were issues with Myanna's personal hygiene. Christina noted that, when Myanna was at school, she acted out and called her at every opportunity. Myanna's grades were good when DCFS was involved, but her grades dropped after the juvenile case was closed. Christina reported a recent incident where Myanna ran away from home and called her. Christina indicated that Myanna wanted to live with her, and she had a care plan for Myanna when at work.

¶ 13    Walter indicated that he was married to Desirii, they resided in a two-bedroom apartment in Champaign, and they had three children together. They planned to move into a four-bedroom home where all of the children would have their own room. He also had two other children, and he had parenting time with those children. Myanna was nine years old and had recently completed third grade. She struggled with reading and was in the literacy enrichment program to assist with that. She had 12 two-day suspensions during the last school year, and her schoolwork had been impacted by her numerous suspensions. Walter noted that, almost every time following a Sunday

5

visit with Christina, Myanna would get suspended from school. Walter acknowledged that Myanna liked seeing Christina and wanted to spend more time with her. He and Christina's communication was negative and not healthy. He believed that, once he obtained custody of Myanna, Christina viewed him as her enemy. During one of Christina's visits, Christina took Myanna to the emergency room because of bruises on her leg, and Myanna told the doctor that Walter had hit her. The doctor called DCFS, but the DCFS investigation was unfounded. Christina also called DCFS to report that there was no food in Walter's house, but that investigation was also unfounded.

¶ 14 Walter indicated that his relationship with Myanna had improved, but there was still room for improvement. He noted that he was the bad guy in Myanna's eyes because he would not always let her get her way. Myanna recently started attending counseling, and Walter noted that her behavior had previously improved with counseling, so he believed that counseling would again help her.

¶ 15 Desirii had a master's degree in social work and was employed at Neighborhood Connection Center in Urbana. Desirii noted that Myanna initially did well when placed in their house; Myanna was in counseling and had regular visits with Christina. However, Myanna started having issues when the juvenile case was closed because all services and regular parenting time with Christina stopped. Myanna recently started counseling again, and Desirii believed that would help Myanna. Myanna was also scheduled for a mental health assessment and mental health services. Desirii indicated that Myanna had difficulty expressing her emotions, she became very upset when she did not get her way, and she did well with routines and schedules. Desirii noted that parenting time with Christina was difficult because Christina would do anything to get Myanna back; Desirii believed that Christina called DCFS to sabotage Myanna's placement with

6

Walter. Desirii indicated that most of Myanna's issues at school were behavioral and that Myanna had issues with reading but was progressing.

¶ 16 Treshawnda Junius, Christina's former daycare provider, indicated that she had known Christina for several years. Junius noted that Christina had a special relationship with Myanna, Myanna adored Christina and missed the interaction with her, Myanna always felt comfortable going to Christina, and Myanna and Christina would do "girl things" together.

¶ 17 Brenda Hill, Christina's counselor, indicated that Christina was progressing in counseling, and, at the next permanency hearing, she was going to recommend that Christina's other children be returned to Christina's home.

¶ 18 During Myanna's interview, Myanna was initially shy and wanted Walter to come with her. She appeared bonded with him. She stated that she liked being at Walter's home but indicated that she wanted to spend more time with Christina and her siblings.

¶ 19 After the interviews and analyzing the relevant best-interest factors, the GAL recommended that Walter be allocated significant decision-making authority and the majority of the parenting time. In making the recommendation on significant decision-making authority, the GAL noted that Walter had been the sole decision maker since he obtained custody of Myanna in January 2022, he demonstrated the ability to act in her best interests, he sought intervention when necessary, and there should be no joint decision-making as the parties had difficulty communicating. The GAL indicated that Christina seemed to believe everything that Myanna told her and called DCFS on Walter to sabotage Myanna's placement with him. She took Myanna to the emergency room when she observed bruising on Myanna's leg rather than contact Walter to discuss the nature of the bruising.

¶ 20    In recommending that Walter be allocated the majority of parenting time, the GAL found that Walter provided the stability and structure that Myanna needed, and he had stable employment and housing. The GAL noted that the family moving to a four-bedroom home would give everyone more space and potentially help Myanna's behavior. Although Myanna had significant behavioral issues at school, Walter addressed those issues through counseling and mental health services. He also sought help with her reading skills by enrolling her in a literacy program. The GAL noted that Myanna experienced the loss of Christina, who had been her primary caretaker, at a young age and was also separated from her young siblings, whom she had lived with her entire life. Thus, the GAL opined that increasing Christina's parenting time would help with Myanna's behavioral issues.

¶ 21    On August 9, 2023, the trial court held a hearing, at which both parties appeared *pro se*, and the following evidence was presented. Brenda testified that, since December 2022, Christina was regularly engaged in counseling and attended a one-hour session every week. Brenda noted that, in that time, Christina was doing a wonderful job, had considerably improved, and had shown that her approach to parenting was wonderful. Brenda indicated that Christina demonstrated that she was capable of proper parenting by showing that she could properly discipline; that she was able to care, love, and nurture her children; and that she was capable of providing a stable home. Christina's testing results were fine, and Brenda had no concerns about Christina's ability to parent. Brenda noted that they discussed the reasons why Christina's children were placed into care, and Brenda was satisfied that Christina understood that the decisions she made that day were wrong and that she would not make that same decision again. Brenda also indicated that Christina completed parenting classes, and Brenda was satisfied that Christina was able to meet the

requirements for parenting all of her children. Brenda noted that if Myanna was returned to Christina, Myanna would be included in the counseling sessions.

¶ 22    Beverly Hill testified that she provided childcare services for Myanna from 2018 until 2019 or 2020 through Illinois Action for Children. During that time, Beverly observed that Myanna was well cared for, Christina loved and nurtured her, Myanna was always properly dressed, and Christina attended Myanna's school events. Beverly described Myanna as really smart and indicated that Myanna was on the honor roll, and she did not have any bad behaviors. Beverly noted that if Myanna was returned to Christina, she would provide childcare services for Myanna. Although Christina gave Beverly's contact information to the GAL, the GAL never contacted Beverly.

¶ 23    Tierra Haywood, Christina's sister, testified that she had custody of Myanna for approximately one year after Myanna was placed in care. During that time, Christina had visits with Myanna, the visits went well, Myanna was always happy to see Christina, and Myanna was comfortable around Christina. Tierra did not have any concerns about Christina being around Myanna, and she was always comfortable giving Christina more time with Myanna. Christina bought them extra food and provided Myanna with clothing and items for school. Walter never visited Myanna during that time or reached out to provide financial support. There were no academic concerns with Myanna during that time. Tierra indicated that if Myanna was returned to Christina, she would have a great support system.

¶ 24    Junius testified that she had known Christina for several years, and she had previously provided childcare services for Myanna. Junius noted that she cared for Myanna when Myanna was a baby until Myanna was approximately three years old. During that time, Myanna was always cared for and well maintained, she was always healthy, and she was happy. Junius described the

relationship between Myanna and Christina as really healthy. Junius observed Christina assisting Myanna with her homework, talking and playing with her, and doing her hair and nails. Although Walter provided childcare for Myanna during this time and also provided financial support, Walter was not consistently providing hands-on care for her. Junius never had contact with Walter.

¶ 25   Junius also observed video visits between Myanna and Christina while Myanna was at Walter's home. During one visit, Myanna cried almost the entire time and was very unhappy because Walter was mocking her and would not leave the room so she could talk to Christina. Junius noted that Myanna was very uncomfortable, was not free with her words, and was not acting like herself. Junius observed a difference in Myanna's behavior when she was permitted to talk to Christina without Walter in the room; Junius noted that Myanna was very free, she showed Christina her toys, and she talked with Christina about what was going on and what she wanted to do once she was returned to Christina. Myanna expressed that, although she wanted to maintain a relationship with Walter, she did not want to live with him and was hopeful that she would return to Christina's home. During those visits, Junius noticed that Myanna's hair was usually not combed, and her clothing was either too small or stained. There were some occasions where Myanna was not wearing deodorant and one occasion where she was not wearing underwear.

¶ 26   Junius observed that Myanna was very opinionated, outspoken, and bright. Christina and Myanna had a very strong bond and a good relationship, Myanna was comfortable having difficult conversations with Christina, and Myanna felt free with Christina. Junius believed that if Myanna was returned to Christina, Myanna would have a better and more stable support system than she had before. Junius noted that Christina diligently worked to correct her past mistakes with her children, and she had shown great strength in doing what was required of her and getting the help she needed. Junius believed that Christina was willing and able to take on the responsibility of

having the children back in her care full-time. Junius would be available if Christina needed childcare for Myanna. Junius opined that Myanna was desperately looking for a sense of normalcy, and Myanna wanted to be where she felt the most comfortable, which was with Christina. Junius noted that, although the love Myanna had for Walter was very strong, she would thrive if she was returned to Christina. Junius indicated that she had no concerns about Myanna being in her home with her children because Myanna had always been very good and respectful.

¶ 27    Christina testified that Myanna was currently nine years old. After Walter was granted custody of Myanna, Christina contacted him several times to schedule visits, but she did not receive any visits until the trial court entered an order establishing a parenting time schedule. Since then, she had been consistent with visits and had even requested additional visits, which Walter denied. During the February 26, 2023, visit, Christina observed bruising on Myanna's leg. Christina asked Myanna about the bruising, and Myanna said that Walter whipped her with a belt. Christina then took Myanna to the hospital where the nurse did a full body scan and discovered multiple bruises on Myanna's body. The hospital took images of the bruising and contacted DCFS because Myanna had told the nurse that Walter whipped her with a belt.

¶ 28    Christina indicated that she had previously contacted Walter about Myanna's hygiene issues and Myanna not wearing underwear. Walter responded that he did not dress Myanna, and Myanna knew better. She also reached out to him when she discovered that Myanna was not doing well in school, but Walter responded that he did not need to communicate with her and that he would see her in court. Christina indicated that she was unable to speak with Myanna's school because Walter's wife had obtained an order of protection against her, but Walter never told the school that the order was ultimately dismissed. Christina indicated that she completed all DCFS recommended services, including parenting classes; she agreed to continue individual and family

11

therapy; and she recently completed a refresher course to learn how to communicate with Walter more effectively.

¶ 29    Walter testified that Myanna lived with him, and he believed that it was in her best interests for her to continue residing with him and for Christina to have parenting time with her. Myanna was entering fourth grade, and she was suspended 13 times the previous year. However, Myanna was on a waiting list for counseling. He explained that he stopped scheduling parenting time between Christina and Myanna because Christina came to his house and was beating on his door and window. Desirii subsequently obtained an order of protection against Christina. He also explained that he canceled her August 13, 2022, visit because she was calling him and cussing him out, and he did not want to be around that behavior.

¶ 30    After hearing the testimony, the trial court entered a written judgment of allocation of parental responsibilities, allocating sole decision-making authority for education and healthcare to Walter, joint decision-making authority for religion and extracurricular activities to the parties, and the majority of the parenting time to Walter. In analyzing the relevant best-interest factors for the decision-making authority allocation, the court made the following findings. Myanna's wishes were unknown. Although she had difficulty adjusting to Walter's home and had struggled in school, she experienced several foster placements since her removal from Christina's house and, since Walter was granted custody in January 2022, has had a safe and stable home environment. She had not been in Christina's care for four years. When the juvenile case closed, and Walter was awarded custody of Myanna without any parenting time provisions for Christina, he was hesitant to include Christina in decision making. He testified that Christina "cussed at him" and appeared at his home "beating on the door and windows." His wife obtained an emergency stalking no

12

contact order against Christina. Thus, the court found that the parties had not demonstrated an ability to share decision making.

¶ 31　The trial court noted that Christina was responsible for the decision making from Myanna's birth until her removal, but Walter had been responsible for the past 19 months. Myanna needed two parents who were actively involved in her life and were interested in her welfare, and both parents needed to be informed about and participate in significant decision making. Both parties lived in Illinois, but they did not live in the same community; Walter lived in Champaign while Christina lived in Blue Island. As soon as Christina was permitted parenting time with Myanna, she took Myanna to the emergency room for bruising, and DCFS was subsequently called. The trial court found that this effort to interfere with Myanna's placement with Walter, particularly in light of the lengthy and traumatic experience that Myanna had already endured in foster care, demonstrated Christina's unwillingness or inability to support Myanna's relationship with Walter. The court noted that, once a court order was in effect, Walter fully cooperated with providing parenting time for Christina. The court found that his reluctance to voluntarily agree to parenting time without a court order was understandable under the circumstances.

¶ 32　Based on the above, the court found that it was in Myanna's best interests for Walter to be allocated sole decision-making authority for education and healthcare. The court noted that the distance and conflict between the parties prevented joint decision making at this time, and Walter was better able to meet Myanna's needs. The court then allocated joint decision-making authority for religion and extracurricular activities to the parties, finding that the parties had an ability to communicate and work together on those issues.

¶ 33　In analyzing the relevant best-interest factors for the parenting time allocation, the trial court made the following findings. Each parent wanted the majority of parenting time and wanted

13

the other party to have unsupervised periods of parenting time. According to the testimony, Myanna wished to spend more time with Christina. It had been 4 years since Myanna was in Christina's physical custody, and Walter had performed the caretaking functions for the past 19 months. Prior to the juvenile case, the course of conduct demonstrated that Christina was Myanna's primary caretaker. Myanna had bonds with other siblings in both homes. Neither party sought a restriction on parenting time.

¶ 34    The trial court found that Walter placed Myanna's needs first, he remained committed to providing a safe and stable home for her, he supported her education, and he met her needs. Christina loved Myanna very much and had made great progress in recognizing the issues that caused Myanna's removal from her home and working to correct those issues. Christina thoughtfully investigated and established care plans for her children so that they would have appropriate supervision. She also remained committed to offering a safe and stable home for Myanna. The court noted that both parents clearly loved Myanna, and Myanna was very fortunate to have a strong bond and loving relationship with each of them. Thus, the court found that it was important for Myanna to enjoy substantial time with each parent. Based on the above, the court found that it was in Myanna's best interests for both parties to have substantial parenting time, but that Walter be allocated the majority of the parenting time and be designated the custodial and residential parent for school and government purposes. The court then established a parenting time schedule for Christina. Christina appeals.

¶ 35                                II. ANALYSIS

¶ 36    Christina contends that the trial court's allocations of decision-making authority and parenting time were against the manifest weight of the evidence. Specifically, she contends that the trial court failed to consider Myanna's wishes, her dedication to Myanna's overall development

14

as evidenced by her active participation in Myanna's schooling, and her concerns about Myanna's cleanliness and wellbeing while in Walter's care.

¶ 37    Under section 602.5(a) of the Illinois Marriage and Dissolution of Marriage Act (Act), the trial court must allocate parental decision-making responsibilities according to the child's best interests. 750 ILCS 5/602.5(a) (West 2022). In determining the child's best interests for allocation of decision-making responsibilities, the court must consider all relevant factors, including: (1) the child's wishes; (2) the child's adjustment to his or her home, school, and community; (3) the mental and physical health of all individuals involved; (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making; (5) the level of each parent's participation in past significant decision-making with respect to the child; (6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child; (7) the parents' wishes; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on decision-making is appropriate; (11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (12) the physical violence or threat of physical violence by the child's parent directed against the child; (13) the occurrence of abuse against the child or other member of the child's household; (14) whether one of the parents is a sex offender; and (15) any other factor that the court expressly finds to be relevant. *Id.* § 602.5(c).

¶ 38    Section 602.7(a) of the Act also instructs that the trial court must allocate parenting time according to the child's best interests. *Id.* § 602.7(a). In arriving at that decision, the court must consider all relevant factors, including: (1) the wishes of each parent seeking parenting time;

15

(2) the child's wishes; (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under two years of age, since the child's birth; (4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child; (5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests; (6) the child's adjustment to his or her home, school, and community; (7) the mental and physical health of all individuals involved; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household; (12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs; (13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child or other member of the child's household; (15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender; (16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and (17) any other factor that the court expressly finds to be relevant. *Id.* § 602.7(b).

¶ 39 The trial court's best-interest determinations are entitled to great deference because the court is in the superior position to observe the proceedings and assess the credibility of the witnesses. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21. A trial court's

determination regarding a child's best interests will not be reversed on appeal unless the decision is against the manifest weight of the evidence, and it appears that a manifest injustice has occurred. *In re P.D.*, 2017 IL App (2d) 170355, ¶ 18. A decision is against the manifest weight of the evidence when the opposite result is clearly evident from the record. *In re Marriage of Betsy M.*, 2015 IL App (1st) 151358, ¶ 61.

¶ 40    As a reviewing court, we may not reweigh the evidence, assess witness credibility, or set aside the trial court's decision simply because a different conclusion could have been drawn from the evidence. See *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51 ("It is well settled that a reviewing court's function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence."). Christina's arguments are essentially asking this court to reweigh the evidence, which we will not do. The record reveals that, in reaching its decisions on parental decision-making authority and parenting time, the trial court thoughtfully considered and evaluated the relevant statutory best-interest factors and the evidence presented on the various factors, including the evidence presented about Christina's concerns about Myanna's wellbeing and cleanliness while in Walter's care, the close relationship and strong bond between Christina and Myanna, Myanna expressing to Christina that she wanted to return to Christina's home, and Christina's dedication to Myanna. Because we find that the trial court's findings were supported by the record and were not against the manifest weight of the evidence, we affirm the court's rulings on decision-making authority and parenting time.

¶ 41                                    III. CONCLUSION

¶ 42    For the foregoing reasons, the judgment of the circuit court of Champaign County is hereby affirmed.

¶ 43    Affirmed.