**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 210059-U

Order filed June 15, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 9th Judicial Circuit, |
| CARLTON R. ALLAMAN, | ) | Warren County, Illinois |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Appeal No. 3-21-0059 |
| and | ) | Circuit No. 18-D-35 |
| | ) | |
| CRYSTAL A. ALLAMAN, | ) | Honorable |
| | ) | James R. Standard |
| Respondent-Appellant. | ) | Judge, Presiding |

JUSTICE O'BRIEN delivered the judgment of the court.
Justices Daugherity and Holdridge concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court did not err when it denied petition to relocate where relocation was not in the best interests of the children.

¶ 2    Respondent Crystal A. Allaman, n/k/a Dougherty, filed a petition to relocate to Tennessee with her two daughters for whom she shared parenting obligations with petitioner Carlton R. Allaman. He objected to the petition. Following a trial, the court denied the petition. Crystal appealed. We affirm.

I. BACKGROUND

¶ 4         Petitioner Carlton R. Allaman and respondent Crystal A. Allaman, n/k/a Dougherty, were married in May 2006 in Tennessee. Two children were born during the marriage, H.A. in May 2013, and A.A. in April 2017. A judgment of dissolution of their marriage was entered in July 2018 in Illinois. An allocation of parenting judgment was also entered in July 2018, which provided residential custody to Crystal and awarded parenting time to Carlton every other weekend from Friday through Monday morning, and Tuesday night to Wednesday morning. In March 2019, Crystal provided notice to Carlton that she wanted to relocate to Tennessee. See 750 ILCS 5/609.2(c) (West 2018). He objected and she filed her petition to relocate in April 2019. *Id.* § 609.2(f). The first hearing on the petition took place on December 19, 2019.

¶ 5         Crystal testified. She was a registered nurse, working as a case manager at a hospice and earning $28 per hour. She had previously worked at a local hospital but left the position during the dissolution proceedings because she had on-call and 12-hour shifts, which were hard to manage as primary caretaker of her daughters. She planned to relocate to Medina, Tennessee, where she grew up and which was approximately 7½ driving hours from Warren County.

¶ 6         She and her daughters currently lived in a farmhouse owned by Carlton's parents. They moved in after she and Carlton divorced. She did not pay any rent but was responsible for the utilities. The house was located in the country and lacked neighbors. Monmouth was 14 miles away and Galesburg was a 35-40 minute drive. She had interviewed for two jobs in Tennessee, one of which she was offered. It involved 12-hour shifts. She had family in Tennessee, including her parents, siblings, and her current husband's mother and siblings. Her husband, Gene Dougherty, worked as an intake counselor at an addiction center, earning $134,000 annually. She performed a Zillow search that revealed available houses in Medina, which was admitted as

representative of houses in the area, not whether those houses were available to buy or rent. She also contacted an individual who rented houses, who informed her he had a house available for her soon at $750 per month in rent. In her opinion, the housing was better in Tennessee.

¶ 7     Crystal also believed the educational opportunities were better in Tennessee. She researched the area schools and provided information on the high school's ratings and available activities and general information on the grade school without rankings or an activities list. She presented a school calendar that was indicative of the general school schedule in Tennessee. There was day care available for A.A. at a local church, which Crystal visited and reserved a spot for A.A., paying $285 per month to hold it. She found a church to attend and had gone to services there with the girls on several occasions. Her friends from high school and college lived in the area and also had young children. She presented information regarding local extracurricular activities and stated incorrectly that children in Tennessee are provided a free community college education.

¶ 8     She further testified that Carlton was involved in cowboy action shooting and travelled out-of-state to participate, which caused him to miss parenting time with the girls. His now-wife was from New Mexico, and he missed parenting time to travel there a couple of times. He began exercising his overnight parenting time on Sundays in September 2019. She and Carlton had decided that H.A. should be at Crystal's house on Sunday nights as a means to aid in her school difficulties. Once those cleared up, Carlton asked for his time back. He and she were both flexible about switching parenting time weekends. Carlton did not see the girls every day. He picked up H.A. from school once or twice a week when Crystal could not be there on time, in addition to pickups on his usual parenting days. She proposed a new parenting plan should she move to Tennessee. It provided Carlton the same number of parenting days he was awarded by the trial court but in larger blocks of days.

¶ 9     She believed it was in the best interests of the girls to move. They would attend better schools and have more activities in which to participate, places are located closer in the community, resulting in less commute for Crystal and more time with her daughters. She had a lot of family living there. There was superior housing in Tennessee and her husband lived in the general area. The available jobs were well-paying. Although one position for which she interviewed was a salaried position, the other one paid less than she currently made. Crystal explained there was no state income tax and the cost of living was less, so she would make up the difference. Her mother was a retired teacher who could help with the girls. Crystal currently relied only on her mother-in-law for assistance.

¶ 10    On cross-examination, Crystal said she had not sought a salaried position in Illinois. The jobs in Tennessee offered the same benefits she had at her current position. She moved to Illinois in 2006 to put down roots with Carlton and start a family. She looked for housing in Monmouth by asking friends after finding no results on Zillow. She did not apply locally for a mortgage or contact any realtors. After her divorce, she dated another man in Tennessee from October 2018 to March 2019 and then began dating her current husband. She had known him 20 years ago and reconnected in April 2019. He proposed in October 2019 and they were married in November 2019. He lived in a rental home in Nashville with a roommate. He has four children with his first wife and one child with his second wife. His 17-year-old son lived with him. Gene visited Illinois 8-to-10 times since they began dating. He worked in Nashville where he was in training and waiting for a job to become available in western Tennessee, where Medina was located. He would be headquartered out of Nashville. Crystal never suggested Gene look for work in Illinois. Crystal took five to six trips to Tennessee beginning January 2019, usually just for the weekend. She stayed

with Gene four of those times. She took her daughters for one overnight with him. H.A. and A.A. did not attend her wedding to Gene.

¶ 11     The church day care she located in Tennessee for A.A. closed in the months of June and July and the afterschool program there had tuition costs. Her proposed parenting calendar did not include parenting time for Carlton on Thanksgiving, Christmas or Christmas Eve. She acknowledged Carlton took the children to the doctor and said she would call him about medical visits when they moved to Tennessee. She would also add him to the school email list. He would be welcome to attend any of the girls' extracurricular activities. In addition, he could drive to Tennessee for an in-person visit or call or FaceTime with the girls. She agreed in-person communication was different from online or phone communication. Her proposed parenting plan included substantial time in the summer for the girls to be with Carlton in two-week increments with the children returning to her in between visits with Carlton. She divided the time that way so she would not have to be away from the children for an extended period. She agreed moving would eliminate Carlton's significant in-person contact with his daughters. After Carlton submitted his interrogatory answers, she was mad and reverted to allowing Carlton to see the girls only on his court-ordered days. She did not know if she told him he could not pick up H.A. and A.A. unless it was his day.

¶ 12     Carol Davis, Crystal's mom, testified. She lived in Tennessee. She did not see her granddaughters on a monthly basis but usually four times a year for holidays.

¶ 13     Crystal rested and the cause was continued. In January 2020, Carlton moved to continue the hearing in order to investigate discrepancies in Crystal's interrogatory answers regarding her knowledge of Gene's background. Status hearings were held throughout the first half of 2020 and

5

in June 2020, Carlton filed a motion to modify the judgment of dissolution in which he sought equal parenting time and the right of first refusal to watch the girls when Crystal was working.

¶ 14    Testimony on the relocation petition resumed in September 2020 after the Covid shutdown. Crystal took the stand to update her testimony. Her work hours had been cut back to 32 hours per week. She had a pre-interview for a job in Tennessee to earn $70,000 annually. In addition, her current employer was looking for registered nurses in Tennessee and she would be able to transfer to a position there. An Indeed search revealed 609 registered nursing jobs available that week in the western Tennessee area. In contrast, the same search for the Galesburg area revealed 48 jobs. One of the jobs in Tennessee previously offered to her was no longer available and the other position instructed her to call when she was ready to work. Her mother was helping with H.A.'s remote learning, as was Carlton and his mother. A.A. was scheduled to begin preschool in Illinois.

¶ 15    Carlton's attorney sought and was allowed to question Crystal as an adverse witness. Her current husband had been to drug and alcohol rehabilitation three times. In 2012, he was terminated from his nursing job at a hospital for stealing patient medication. His nursing license had been on probation for four years and was suspended in 2019 for his failure to pay child support. It was reinstated once he paid. He had been arrested for driving under the influence and domestic violence. Orders of protection were entered against him by his former wives. On redirect examination, Crystal said Gene currently held a nursing license in Tennessee and two of his children now lived with him. On recross-examination, she acknowledged the longest period of continual time she spent with Gene had been a week and a half.

¶ 16    Carlton testified. He was employed as a field sales agronomist and had a flexible work schedule. After Crystal received his interrogatory answers, she refused to allow him extra time with the girls from September 2019 through November 2019. Since Covid, he was seeing them

more because Crystal was still required to go to work. He interacted with his daughters almost daily. He or his mother picked up A.A. from preschool. H.A. had just started at the newly reopened YMCA day care two days a week on Crystal's days. On his parenting days, day care was not necessary. H.A. was also back to tumbling after the program resumed. His activities with the girls included bike rides, walks, and working with their horses. Both girls had ponies at his parents' farm. He would not be able to participate in his daughters' daily and extracurricular activities if they moved to Tennessee. When the girls have visited Tennessee with their mother, his ability to communicate with them has been poor.

¶ 17    In his view, FaceTime is an inadequate means of communication. A.A.'s attention span was short, and although the technology worked well with H.A., it was no substitute for in-person interaction. He currently communicated with the personnel at H.A.'s school when he picked her up and dropped her off. He attended school board meetings. He helped H.A. with homework. He objected to the move because he does not believe life would be better for H.A. and A.A. in Tennessee. In his view, they have a pretty good life in Illinois. There are a lot of opportunities for them and they have plenty of support. His relationship with them would change if they moved to Tennessee.

¶ 18    On cross-examination, he acknowledged that he attended only one parent-teacher conference for H.A. but said he contacts and texts with H.A.'s teacher. He helped her one time with remote learning. He had not attended her dance recitals because he was not available. He was gone for 12 weekends from June 2018 to summer 2019, including for work, his hobby, or vacation. He traveled once a year to New Mexico to visit his wife's family. He had A.A. screened for preschool without informing Crystal. On redirect examination, he clarified that when he spoke to

7

Crystal about preschool for A.A., she said it was not an issue because they would be in Tennessee by then.

¶ 19    In response to the court's inquiry, Carlton said he had H.A. for the first day of school for second grade but stopped by Crystal's house on the way to school for pictures. He did not share the pictures he took at the school with Crystal.

¶ 20    Sarah Allaman testified. She was Carlton's mother. She had ponies for the girls on her farm. She had always helped with day care. In the summer of 2020, she had the girls three times a week. On cross-examination, she acknowledged that she enjoyed a good relationship with Crystal and with Crystal's mother.

¶ 21    Crystal testified in rebuttal. She had invited Carlton to call Gene but he refused the offer. She started the relocation process before she was dating Gene. She denied poor communication between Carlton and the girls when they were in Tennessee, stating he talked to them almost every time they visited. When she and Carlton were married, moving back to Tennessee was mentioned but he did not want to talk about it. He said it would never happen. She thought he knew she would have liked to move back to Tennessee. On cross-rebuttal, Crystal said Gene had been to Illinois four or five times between August and December 2019, but she never offered to introduce him to Carlton. She tried once in December 2019 but Gene was sick. From January to September 2020, Gene had visited her in Illinois three times.

¶ 22    The parties submitted written closing arguments and the trial court issued a written ruling on December 30, 2020, and entered an order on January 5, 2021, denying Crystal's petition to relocate. She timely appealed.

¶ 23                                    II. ANALYSIS

8

¶ 24    The issue on appeal is whether the trial court erred when it denied Crystal's petition to relocate. She argues that the statutory factors and caselaw concerning relocation favor granting her petition.

¶ 25    A parent with the majority of parenting time may petition the court to relocate out-of-state with the children. In determining the petition, the trial court considers the following factors in regard to the children's best interests:

"(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

9

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g) (1)-(11) (West 2018).

¶ 26   In relocation cases, the court's paramount consideration is whether the move is in the child's best interests. *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988). The parent seeking relocation bears the burden to prove that relocation is in the best interest of the child. *Id.* A best interest determination should be made on a case-by-case basis, depending on the particular circumstances. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32 (citing *Eckert*, 119 Ill. 2d at 326). When considering a petition for relocation, the trial court should be guided by the principles of the Illinois Marriage and Dissolution of Marriage Act, which purpose includes "to 'secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children.' " *Eckert*, 119 Ill. 2d at 328 (quoting Ill. Rev. Stat. 1986, ch. 40, ¶ 102(7)). The function of the reviewing court is not to reweigh the trial court's assessment of the relevant factors and the witness credibility and reverse the trial court merely because it would reach a different conclusion. *In re Parentage of P.D.*, 2017 IL App (2d) 170355, ¶ 19 (citing *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992)). We will not reverse a trial court's decision on a petition to relocate unless it was against the manifest weight of the evidence. *Fatkin*, 2019 IL 123602 ¶ 32 (citing *Eckert*, 119 Ill. 2d at 328).

¶ 27   The trial court issued findings based on the statutory factors. As to the first factor, the circumstances and reasons for the intended relocation, the court noted Crystal wanted to return to the area where she grew up but rejected her claim that the schools and day care were better in Tennessee. The court noted that Crystal did not have housing or employment in Tennessee but that

she believed she could obtain both. She offered evidence of two job offers, which were no longer available at the time of the continued hearings. Similarly, she offered real estate listings of Zillow as representative of what was available in the area. Her current husband lives nearly two hours away from the area she plans to move and is in a training program for a potential future position. The court found there was no financial benefit to moving. We agree. We note also that Crystal currently lived rent-free in a home owned by ex-in-laws, and although she apparently does not like the home, she had made few efforts to find alternative local housing. Similarly, as noted by the trial court, she did not explore employment options in Illinois and the jobs that were seemingly available to her in Tennessee had hours and pay comparable to her current and former positions.

¶ 28    The second *Eckert* factor is the reasons Carlton objected to the intended relocation. The court found that Carlton was concerned about the disruption in the quality and quantity of the time he spends with his daughters, as well as the effect the relocation would have on the relationship between his children and their extended family in Illinois. The court determined that the move to a location 7½ hours away would be detrimental to the quality of Carlton's relationship with the girls and would also be a "significant challenge" to transport the children back and forth. Both Crystal and Carlton testified that they moved to Illinois in 2006 to put down roots and start a family. While Crystal says Carlton knew she would have liked to move back to Tennessee, he says they never discussed the topic. The court's conclusion on this factor is supported by the evidence.

¶ 29    The third factor looks at the history and quality of both parents' relationship with the children and whether either parent has not exercised his or her parental responsibilities. The trial court concluded that both parents have good relationships with the girls, that Crystal was the primary caregiver, and that Carlton's involvement increased significantly and was at a high level. Indeed, the evidence established that both parents were engaged in their daughters' lives and by

11

all accounts worked to ensure that the girls were healthy and happy. Crystal and Carlton both participated in the girls' schooling, day care and extracurricular activities.

¶ 30    The available educational opportunities for the girls is the fourth factor. The court found that there was "little difference in the quality or the opportunities" between the schools in Illinois and in Tennessee and any differences in extracurricular activities were insignificant. Crystal presented evidence on the high school in Tennessee where the girls would eventually attend but it was irrelevant to their current circumstances, particularly when A.A. was still in preschool and H.A. was in elementary school. The information she offered on the local elementary school was merely basic statistics such as class size. The trial court expressed that the school information Crystal submitted had "little relevance." In addition, she did not offer any information on the school H.A. currently attended and did not compare the Tennessee and Illinois schools.

¶ 31    The fifth factor is whether there is extended family in either location. As the court found, this factor is neutral. Crystal's parents and siblings live in the Tennessee area to which she wants to relocate. Carlton's parents and siblings live in the area in Illinois where the children currently reside. The girls are close with Carlton's mother, spending time on the family farm and tending to their horses there. Crystal's mother came to stay to help with remote learning. However, she testified that she saw H.A. and A.A. about four times per year, usually on the holidays. By contrast, the girls spent considerable time on their paternal grandparents' farm and Carlton's mother was an integral part of the girls' daily lives.

¶ 32    The next *Eckert* factor is the anticipated impact of the relocation. The court found, and we agree, that the significant impact would be in the quality and frequency of interaction between Carlton and his daughters and that the impact would be negative. It is undisputed that Carlton spent significant time with H.A. and A.A. He had been available to, and did, pick his daughters up from

12

school and day care when Crystal could not. He transported them to YMCA programs and other extracurricular activities. He would pick up and tend to the girls if one of them was sick. He would communicate with H.A.'s teachers when he picked her up or dropped her off at school. On occasion, he would drop by Crystal's home and take the girls out on the four-wheelers for an unscheduled outing. These interactions would cease to exist were the girls to live in Tennessee.

¶ 33    The next factor considers whether the court would be able to reasonably allocate parental responsibilities if the relocation was allowed. The trial court documented that the distance between Illinois and the Tennessee area where Crystal wants to move eliminated the possibility for short-term, *i.e.*, weekend visits, between the girls and Carlton. He would be left with parenting time only during the girls' school breaks and holidays. Additionally, the trial court expressed concern regarding the effect of travelling on the girls and their ability to adapt to the circumstances. The court concluded that it could not allocate a reasonable alternative of parenting time. We agree. Any parenting time would be consumed with two full days of travel, thus eliminating parenting time for Carlton on three-day weekends or random days off school. He now enjoys regular contact with his daughters during the week and at least every other weekend. None of those opportunities could be fashioned into a workable parenting plan if the girls lived in Tennessee.

¶ 34    The trial court found the eighth factor did not apply due to the young age of the children.

¶ 35    The ninth factor looks at whether arrangements could be made so the parents could exercise their responsibilities. The court found there was no evidence presented on this factor. However, the record demonstrates that Crystal testified that she would call Carlton about the girls' medical appointments and ask the school to add him to the parent email list. She also stated he could come to Tennessee whenever he liked to attend one of the girls' sporting events or recitals. Her proposed parenting plan provided that the girls would spend every Thanksgiving, Christmas Eve and

13

Christmas with her, which would not only deprive Carlton of his holiday time with his daughters, but it would also lessen the time he would have with them during the holiday breaks from school. We note that Crystal also arranged the summer breaks for the girls so that they would not be away from her for more than two weeks at a time while leaving Carlton with extended periods without parenting time. We do not construe that Crystal's suggestions are viable or that they would allow Carlton to exercise his parental responsibilities.

¶ 36 Minimization of impairment of the parent-child relationship caused by the relocation is the next factor. Crystal asserted that her parenting plan allows her and Carlton to share parenting time, claiming that Carlton would enjoy the same number of parenting days under her proposed plan as he does now with the girls residing in Illinois. The court properly rejected Crystal's assertion, finding that "minimization is more than a time share plan." It found that Crystal did not offer any evidence of arrangements that would continue Carlton's substantial involvement with his children. Although she proposed that he could have regular communication with H.A. and A.A. via Skype, FaceTime and phone calls, she also admitted they were not substitutes for in-person interactions. Furthermore, Carlton testified that he had difficulty reaching the girls when they travelled with Crystal to Tennessee to visit. Although she denied his claim, she did acknowledge that at least one weekend there was no contact.

¶ 37 As to the final factor, any other relevant factors that would bear on the girls' best interest, the trial court concluded that it had addressed all the relevant factors. We agree and therefore find that the trial court's decision to deny Crystal's petition to relocate was not against the manifest weight of the evidence.

## III. CONCLUSION

¶ 38 For the foregoing reasons, the judgment of the circuit court of Warren County is affirmed.

¶ 39          Affirmed.